IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

DERRICK LEE JOHNSON                                    PETITIONER
ADC #110079

V.                          NO. 5:07cv00285 JMM-JWC

LARRY NORRIS, Director,                                RESPONDENT
Arkansas Department of Correction

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge James M. Moody.   Any party may serve and file written objections to this recommendation.   Objections should be specific and should include the factual or legal basis for the objection.   If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.   An original and two copies of your objections must be received in the office of the United States District Court Clerk no later than eleven (11) days from the date of the findings and recommendations.   The copy will be furnished to the opposing party.   Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.      The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## RECOMMENDED DISPOSITION

Derrick Lee Johnson, an Arkansas Department of Correction (ADC) inmate, brings this 28 U.S.C. § 2254 petition for writ of habeas corpus (doc. 2), along with a supporting brief (doc. 3), challenging application of Arkansas's "seventy percent law" to computation of his transfer eligibility date.  By previous orders (docs. 13, 15, 24, 35), the Court rejected Respondent's arguments for dismissal of the petition as a successive application requiring authorization from the Eighth Circuit Court of Appeals pursuant to 28 U.S.C. § 2244(b), or as barred by the one-year statute of limitations applicable to federal habeas petitions pursuant to § 2244(d).  As directed by the Court, Respondent filed a supplemental response (doc. 38), to which Petitioner replied (doc. 47).  For the reasons that follow, the petition should be **denied** in its entirety.

I.

Following a jury trial in December 1996 in the Circuit Court of Pulaski County, Arkansas, Petitioner was convicted of two counts of aggravated robbery, one count of

residential burglary, and one count of theft of property.  (Resp't Ex. 9 [doc. 38-2].)  A few days after his jury trial, he pleaded guilty in the same court to first degree murder, and he was sentenced as an habitual offender to a cumulative imprisonment term of 600 months (50 years).  (Resp't Ex. 1 [doc. 17-2].)  He did not appeal the jury convictions and, by pleading guilty, he waived his right to a direct appeal of the murder conviction under Arkansas law.  Ark. R. App. P.-Crim. 1(a) (1996).  He then filed a petition for post-conviction relief in the state circuit court pursuant to Ark. R. Crim. P. 37, which was denied. *Johnson v. State*, No. 96-1124 (Pul. Co. Cir. Ct.  Apr. 10, 1997) (Resp't Ex. 2 [doc. 17-3]).  He did not appeal.

In October 1998, Petitioner filed a § 2254 habeas petition in this Court, challenging the validity of his first degree murder conviction.  The petition was dismissed with prejudice as untimely under 28 U.S.C. § 2244(d), and, alternatively, as procedurally barred due to his failure to first raise his claims in state court in a timely and procedurally correct manner. *Johnson v. Norris*, No. PB-C-98-461-JWC (E.D. Ark. Jan. 26, 1999) (Resp't Ex. 3 [doc. 9, at 9-20]).  Petitioner did not appeal.

On October 8, 2000, Petitioner wrote a letter to the state circuit court judge, seeking modification of his sentence to avoid imposition of Arkansas's "seventy percent rule."  (*See* Resp't Ex. 3 [doc. 17-4].)  At that time, Arkansas law provided that any person convicted of certain Class Y felonies, including first degree murder and aggravated robbery, was not eligible for parole or community punishment transfer until he had served seventy percent of his sentence.  Ark. Code Ann. § 16-93-611(a) (2000).  The sentencing judge could waive application of the rule if the defendant was a juvenile, he was merely an accomplice to the offense, and the offense occurred on or after July 28, 1995.  *Id.* § 16-93-611(b).  In

response to Petitioner's letter, the state circuit court stated that Petitioner had not met the statutory criteria to avoid imposition of the rule.  (Resp't Ex. 3 [doc. 17-4].)

On December 7, 2005, Petitioner filed two separate administrative grievances challenging the ADC's computation of his time.  The first, No. VU-05-00649, alleged that he had been denied due process and equal protection and subjected to an *ex post facto* violation in the ADC's computation due to the application of "Act 1197 of 1997 ... under the guise of Act 1326 of 1995."  (Resp't Ex. 4 [doc. 17-5].)  The second grievance, No. VU-05-00650, alleged that the ADC unconstitutionally computed his transfer eligibility date under the provisions of Act 1197 of 1997, requiring him to serve seventy percent of his sentence before becoming eligible for transfer to alternative forms of community punishment (doc. 3, at 39).  Both grievances were denied at all levels of the ADC's administrative process. (Resp't Ex. 5 & 6 [docs. 17-6, 17-7]; doc. 3, at 36-38.)

On February 13, 2007, Petitioner filed a state petition for writ of habeas corpus in the Lincoln County Circuit Court, raising the same arguments he had raised in his ADC grievances (doc. 3, at 42-49).  The circuit court denied the petition, finding that Petitioner had not shown, as required under the state habeas statutes, that the trial court which convicted him lacked jurisdiction or that his judgment of conviction was facially invalid. *Johnson v. Norris*, No. LCV-2007-16-2 (Lincoln Co. Cir. Ct. May 7, 2007) (Resp't Ex. 7 [doc. 17-8]); *see* Ark. Code Ann. § 16-112-101, *et seq.*; *Blevins v. Norris*, 722 S.W.2d 573, 574 (Ark. 1987) (state habeas petition not proper remedy for challenging constitutionality of parole eligibility statute).  On May 29, 2007, Petitioner submitted to the circuit clerk a notice of appeal and designation of record, but the record was never lodged.  (*See* Resp't Ex. 8 [doc. 17-9]; doc. 3 at 22, 66-90.)

II.

Petitioner now brings this federal habeas petition, advancing the following claims

for relief:

1. He was denied his right to appeal the denial of his state habeas petition, in violation of the First, Fifth and Fourteenth Amendments to the United States Constitution, and under the Arkansas Constitution;

2. Act 1326 of 1995 is facially invalid, and its use against him in computing his transfer eligibility date violates his rights to due process and equal protection under the Fifth and Fourteenth Amendments to the United States Constitution, and under the Arkansas Constitution;

3. He was denied his right to transfer eligibility laws in effect at the date of commission of the offense, in violation of his rights to due process and equal protection under the Fifth and Fourteenth Amendments to the United States Constitution, and under the Arkansas Constitution; and

4. He was subjected to an *ex post facto* violation, in violation of the United States and Arkansas Constitutions, when Act 1197 of 1997 was used against him.

The Court previously dismissed Ground 1 as failing to state a cognizable federal

habeas claim (doc. 24, at 9; doc. 35).  This recommendation addresses the remaining

claims.

III.

Under Arkansas law, the ADC provides "the administrative structure ... to oversee

the daily operation of secure prison facilities," while the Department of Community

Correction (DCC) provides the administrative structure " to oversee the development and

operation of community correction[1] facilities, programs, and services, including probation

---

[1]While the Arkansas legislature initially used the term "community punishment," the statutory references were later changed to "community correction."  *See, e.g.*, 2005 Ark. Acts 1994, §§ 287, 288, 289 (substituting term "correction" for "punishment"); 2001 Ark. Acts 323, § 2

and parole supervision." Ark. Code Ann. § 16-93-1202(4) & (5).  The DCC oversees a wide variety of nontraditional correction facilities and nonresidential community correction programs, including home detention, community service, work-release, boot camps, drug and alcohol treatment, and educational and vocational services.  *Id.* §§ 16-93-1201(b)(1), 16-93-1202(2).  A "transfer date" is the "earliest date on which an offender is eligible for transfer" from the ADC's traditional correctional facilities to DCC facilities, programming or supervision.  *Id.* § 16-93-1202(11) & (12)(A).

Petitioner's remaining claims (Grounds 2, 3 and 4) concern the computation of this date, also called a transfer eligibility date or a TE date.  He submits a time computation summary (doc. 3, at 31), showing him to have a "TE date" of February 5, 2031.

A careful reading of Petitioner's filings shows his specific arguments to be as follows.  Parole eligibility is determined by the law in effect at the time the crime is committed.  *Boles v. Huckabee*, 12 S.W.3d 201, 202 (Ark. 2000).  Petitioner was convicted of first degree murder with an offense date of August 18, 1995, and of aggravated robbery and other crimes with an offense date of September 25, 1995.  (Resp't Ex. 1 [doc. 17-2]; Resp't Ex. 9 [doc. 38-2].)  At the time of his offenses, Act 1326 of 1995 had recently become effective, providing that any prisoner convicted of certain offenses (including first degree murder and aggravated robbery) was not eligible "for parole" until he had served seventy percent of his sentence.[2]  The act was codified at Ark. Code Ann. § 16-93-611.

_____

(renaming Department of Community Punishment as Department of Community Correction).  The terms are used interchangeably in this recommendation.

[2]Act of Apr. 14, 1995, No. 1326, 1995 Ark. Acts 1326, § 1 (codified originally as Ark. Code Ann. § 16-93-611 (1995)).  The Act applied to offenses committed on or after July 28, 1995.  *See id.* § 2 & notes to Ark. Code Ann. § 16-93-611. The original version of the statute read:

Notwithstanding any law allowing the award of meritorious good time or any

Two years later, Act 1197 of 1997 added language stating that such a prisoner also was ineligible for "community punishment transfer" until he had served seventy percent of his sentence.[3]  This, of course, was after Petitioner's offense dates.  Petitioner says that, on January 18, 2006, the ADC denied his request to attend vocational training classes on the basis that he was not within three years of his transfer eligibility date, which had been computed by the ADC based on the seventy percent limitation.

His argument here is that, based on the statute in effect on his offense dates, the seventy percent limitation applies only when considering eligibility for parole, not transfer to alternative forms of community correction.  He says the 1995 statute facially applies only to parole eligibility, that other statutes at the time governed the computation of transfer eligibility, and that the Arkansas Attorney General has issued opinions clarifying that parole eligibility and transfer eligibility are not synonymous.[4]  He says use of the later-enacted

---

other law to the contrary, any person who is found guilty of or pleads guilty or nolo contendere to murder in the first degree, kidnapping, aggravated robbery, rape, and causing a catastrophe shall not be eligible for parole until the person serves seventy percent (70%) of the term of imprisonment to which the person is sentenced.

[3] Act of Apr. 8, 1997, No. 1197, 1997 Ark. Acts 1197, § 2 (codified as amended at Ark. Code Ann. § 16-93-611 (1997)).  The amended version of the statute read:

Notwithstanding any law allowing the award of meritorious good time or any other law to the contrary, any person who is found guilty of or pleads guilty or nolo contendere to murder in the first degree, § 5-10-102, kidnapping, Class Y felonies, § 5-11-102, aggravated robbery, § 5-12-103, rape, § 5-14-103, and causing a catastrophe, § 5-38-202(a), shall not be eligible for parole or community punishment transfer until the person serves seventy percent (70%) of the term of imprisonment, including a sentence prescribed under Arkansas Code § 5-4-501, to which the person is sentenced.

The current version of these provisions appears at Ark. Code Ann. § 16-93-611(a)(1).

[4] According to the opinions, the legislature used the term "parole" in its traditional sense to mean the release of an offender from incarceration or imprisonment into the community, while "transfer" means a transfer to alternative forms of punishment, which may entail release into the community or continued incarceration in a correctional facility.  Ark. Att'y Gen. Op. No. 97-225,

1997 statute to extend the seventy percent limitation to transfer eligibility dates violates his due process and equal protection rights and constitutes an *ex post facto* violation.

As a threshold matter, Respondent views Petitioner's claims as challenging only his transfer eligibility date, stating that he does not dispute that his parole eligibility date is subject to the seventy percent law.  Petitioner objects to this characterization, stating that he "absolutely dispute[s] that Act 1326 applies to [him] in any form or fashion," including in determination of a parole eligibility date (doc. 47, at 7).  In support, he contends that Act 1326 is "facially invalid" because it could not supplant existing state statutes that addressed parole and transfer eligibility, *i.e.*, Act 530 of 1993 (codified as amended at Ark. Code Ann. § 16-93-206) and Act 534 of 1993 (codified as amended at Ark. Code Ann. § 16-93-1302) (doc. 3, at 13-15).  It is undisputed that Act 1326 was in effect at the time Petitioner's offenses were committed and that it explicitly referred to parole eligibility.  Act 1326 contained specific language indicating that it was intended to create an exception to any ostensibly conflicting statutes, *i.e.*, "[n]otwithstanding any law allowing the award of meritorious good time or any other law to the contrary..."  Act 1326, § 1.  Therefore, it clearly was the governing law regarding determination of the date Petitioner was eligible for release on parole.  *See Boles*, 12 S.W.3d at 202; *Woods v. Lockhart*, 727 S.W.2d 849, 850-51 (Ark. 1987).  The only remaining issues concern computation of the date he becomes eligible for transfer to DCC facilities, programming or supervision.

Respondent argues, first, that federal habeas jurisdiction does not lie for Petitioner's claims because they do not challenge the fact or duration of his physical confinement.  In

---

1997 WL 546248, at *5-*6 (Ark. A.G. Aug. 6, 1997); Ark. Att'y Gen. Op. No. 95-259, 1995 WL 581771, at *5 (Ark. A.G. Sept. 22, 1995); Ark. Att'y Gen. Op. No. 95-223, 1995 WL 583185, at *4-*5 (Ark. A.G. Sept. 8, 1995).

reply, Petitioner alleges that a transfer eligibility date "makes [him] eligible to be released from prison on transfer status," that he seeks the "speediest release that is absolutely due him," and that he is illegally being required to serve thirty-five years of his sentence in the ADC's physical custody instead of being transferred to community programs (doc. 47, at 6-9). Although it is questionable whether his claims actually implicate the fact or duration of his confinement, the Court has nonetheless liberally construed his filings in light of these and other allegations and will not dismiss on this basis.

Respondent also argues that Petitioner's claims concern only state law violations that do not implicate the federal Constitution. As will be seen, some of the issues raised by Petitioner require interpretation of the state statutes governing parole and transfer eligibility. A federal court may issue a writ of habeas corpus only when a conviction violates the Constitution, laws or treaties of the United States. 28 U.S.C. §§ 2241, 2254. "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see Bagley v. Rogerson*, 5 F.3d 325, 328 (8th Cir. 1993) (a "violation of state law, without more, does not state a claim under the federal Constitution"). Therefore, whether the ADC or the state courts have properly interpreted state laws regarding computation of parole or transfer eligibility dates does not, without more, give rise to a constitutional violation. *Garner v. Howell*, 840 F.2d 616, 617 (8th Cir. 1988) (alleged errors in interpretation or application of state statute governing determination of parole eligibility date for habitual offenders); *Schwindling v. Smith*, 777 F.2d 431, 433 (8th Cir. 1985) (same). To the extent that Petitioner alleges only violations of state law or the

Arkansas constitution or asks this Court to interpret the governing state statutes, he is not entitled to federal habeas relief.[5]

Petitioner's due process, equal protection and *ex post facto* claims clearly arise under federal law, albeit with intertwining state-law issues.  However, as discussed below, these federal claims are without merit.

IV.

A.    Due Process.  Petitioner's due process claims rest on the proposition that he possesses a liberty interest in determination of the date he is eligible for transfer to DCC facilities, programming or supervision.

The Fourteenth Amendment to the Constitution provides in part that no state shall "deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  The possession of a protected interest is a "condition precedent" to either a procedural or a substantive due process claim, and "where no such interest exists, there can be no due process violation."  *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999) (internal quotation marks and alterations omitted).  Protected liberty interests may

_____

[5]For example, Respondent asserts that, because Petitioner is not a "target" offender as defined by the community correction statutes (non-violent, non-sexual), he could not be eligible for physical transfer to any DCC facilities until the date he is eligible for release on parole, making his transfer eligibility date the same as his parole eligibility date with regard to DCC facilities. Respondent states that the parole eligibility provisions provide "the only mechanism by which certain offenders, like Johnson, may move from physical incarceration in the ADC to supervision and programs of the DCC" (doc. 38, at 2).  Petitioner does not concede this, but argues that, even if true regarding DCC facilities, he remains eligible for DCC programming and services within the physical confines of the ADC and should be considered for such programs unimpeded by the seventy percent limitation, *e.g.* substance abuse, anger management, pre-release, GED, vocational training, etc. (doc. 47, at 4).  Regardless of whether Respondent is correctly interpreting the statutes in this respect, Petitioner has established no federal constitutional violation regarding DCC facilities *or* other programming, as explained herein.

arise from the Due Process Clause itself or from state laws.  *Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005).

The Due Process Clause does not protect prisoners from every adverse change in their confinement and does not, itself, create a protected liberty interest in any particular prisoner classification or in eligibility for rehabilitative programs or educational or vocational opportunities in the prison system.  *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Wishon v. Gammon*, 978 F.2d 446, 450 (8th Cir. 1992); *Stewart v. Davies*, 954 F.2d 515, 516 (8th Cir. 1992). This includes eligibility for work release programs.  *Callender v. Sioux City Residential Treatment Facility*, 88 F.3d 666, 668 (8th Cir. 1996).  Nor does the transfer of prisoners from one institution to another invoke the protections of the Due Process Clause, even if it involves "less amenable and more restrictive quarters."  *Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Meachum v. Fano*, 427 U.S. 215, 225 (1976).  Furthermore, a convicted person has no federal constitutional or inherent right in the possibility of future parole or conditional release before the expiration of a valid sentence, or in the determination of a specific parole eligibility date.  *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979); *Adams v. Agniel*, 405 F.3d 643, 645 (8th Cir. 2005) (inmate has no federal constitutionally protected liberty interest in the possibility of parole); *Smith v. Norris*, 40 Fed. Appx. 305, *1 (8th Cir. 2002) (inmate has "no federal right to have specific release and parole eligibility dates calculated").

No liberty interest arises from state law "unless the state statute or regulation involved uses mandatory language and imposes substantive limits on the discretion of state officials."  *Snodgrass v. Robinson*, 512 F.3d 999, 1003 (8th Cir.), *cert. denied*, 129 S. Ct. 42 (2008); *see Nolan  v. Thompson*, 521 F.3d 983, 989 (8th Cir. 2008); *Bagley*, 5

F.3d at 328-29.  Additionally, state-created liberty interests are limited to freedom from restraint which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," or to actions which "inevitably affect the duration of [a prisoner's] sentence."  *Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995).

Nothing in the Arkansas statutes creates a protectible liberty interest in participation in vocational or rehabilitative programs, in transfer to facilities which provide such programs, or in calculation of a specific transfer or parole eligibility date.

Under the applicable Arkansas statutes, ADC officials are granted broad discretion in assigning inmates to various programs, services and work activities within the prison, and in determining their eligibility to participate in vocational, educational and rehabilitative activities, including work release.  Ark. Code Ann. §§ 12-29-101(d), 12-30-401.  The ADC also has discretion in determining the appropriate facility for each inmate and "may transfer an inmate from one ... facility to another consistent with the commitment and in accordance with treatment, training, and security needs."  *Id.* § 12-27-135(a).  *See Sandin*, 515 U.S. at 478-79 (where no state law strips state officials of the discretion to transfer prisoners to alternative facilities "for whatever reason or for no reason at all," no state-created liberty interest is implicated).

Similarly, the Arkansas statutes place minimal limitations on the discretion of the Board of Corrections, the Parole Board, the ADC and the DCC, regarding parole and transfer eligibility.  The statutes provide that the Parole Board "may" release an individual on parole when, in its opinion, there is a reasonable probability that he can be released without detriment to the community or himself.  Ark. Code Ann. § 16-93-701(a)(1).  The statutes addressing transfer eligibility expressly state that "[n]othing in this subchapter shall

grant any offender the right to be sentenced or transferred under this subchapter as a matter of right." *Id.* § 16-93-1210. Eligible offenders are transferred by the ADC to DCC programs "in accordance with the rules and regulations promulgated by the Board of Correction and Community Punishment and conditions set by the Post Prison Transfer Board." *Id.* § 16-93-1208(a)(1)(A). The statutes clearly provide for discretion on the part of the Board in determining if or when a particular inmate will be paroled or transferred from the ADC to DCC supervision, as well as in imposing any conditions. *See generally id.* §§ 16-93-206, 16-93-1208, 16-93-1302.

The Arkansas Supreme Court has repeatedly emphasized the broad discretionary authority granted under the state's parole and transfer statutes. *Michalek v. Lockhart*, 730 S.W.2d 210, 211 (Ark. 1987); *see Dougan v. Ford*, No. 04-623, 2005 WL 2387576, *2 (Ark. Sup. Ct. Sept. 29, 2005) (unpub.) ("If the conditions [set by the Board] are too onerous, appellant could decline to accept the conditions set, and elect to serve out his sentence instead."); *Ensey v. Norris*, No. 99-752, 2001 WL 469154, *2 (Ark. Sup. Ct. May 3, 2001) (unpub.) (Board "possesses power and discretion" to deny transfer to DCC or set conditions for transfer; citing § 16-93-1210 and stating, "Transfer is not, however a matter of right."); *Maxie v. Gaines*, No. 94-313, 1994 WL 571967, *1 (Ark. Sup. Ct. Oct. 10, 1994) ("the statute which provides in pertinent part that the parole board may release an eligible prisoner under certain conditions ... does not create a liberty interest in parole; that is, the board's determinations regarding parole are discretionary").

Examining the language and structure of the statutory parole scheme, the Eighth Circuit has held that the applicable statutes do not establish any right to release on parole which would invoke due process protection. *Pittman v. Gaines*, 905 F.2d 199, 201 (8th Cir.

1990); *Parker v. Corrothers*, 750 F.2d 653, 655-57 (8th Cir. 1984); *see Hamilton v. Brownlee*, 237 Fed. Appx. 114, 115 (8th Cir. 2007) (unpub.) (Arkansas parole statutes do not create protectible liberty interest in discretionary parole decisions); *Robinson v. Mabry*, 476 F. Supp. 1022, 1023 (E.D. Ark. 1979). Petitioner has not identified any substantive difference in the statutes governing transfer eligibility that would mandate a different conclusion. Indeed, the transfer eligibility statutes explicitly state that they are not intended to confer any right to transfer. Ark. Code Ann. § 16-93-1210.

In arguing that transfer eligibility should not be subject to § 16-93-611's seventy-percent limitation, Petitioner points to language in Act 530 of 1993 (now codified as amended at § 16-93-206(c)(1)), which provides that inmates sentenced for certain Class Y felonies (e.g., homicide and aggravated robbery) "shall be eligible for discretionary transfer" to the DCC after serving one-third or one-half of their sentence with credit for meritorious good time, depending on the seriousness determination made by the Arkansas Sentencing Commission (doc. 3, at 14; doc. 47, at 1, 3-4).[6] Petitioner also refers to Act 534 of 1993, now codified as amended at Ark. Code Ann. § 16-93-1302(b)(1), providing that certain Class Y felony inmates "shall be eligible for discretionary transfer" to the DCC "after having served the time required as set by the Arkansas Sentencing Commission" (doc. 3, at 7, 13-15; doc. 47, at 1).[7]

Statutory interpretation is a matter of state law, and the Arkansas courts strive "to reconcile statutory provisions relating to the same subject matter to make them sensible, consistent and harmonious." *City of Jacksonville v. City of Sherwood*, 289 S.W.3d 90, 95

---

[6]Act of Mar. 16, 1993, No. 530, 1993 Ark. Acts 530, § 2(c)(1).

[7]Act of Mar. 16, 1993, No. 534, 1993 Ark. Act. 534, § 2(b).

(Ark. 2008).  While the cited statutes do appear to conflict, they can be harmonized as §
16-93-611 contains specific language, as stated, indicating that it is intended to create an
exception to any conflicting statutes, *i.e.*, "[n]otwithstanding any law allowing the award of
meritorious good time or any other law to the contrary..."  This exception language was in
the original 1995 enactment (Act 1326), at a time when the provisions of both Act 530 and
Act 534 were already in existence.  *See* Ark. Att'y Gen. Op. No. 99-450, 2000 WL 297238
(Ark. A.G. Feb. 24, 2000) (statutes can be reconciled by interpreting § 16-93-111 as
creating an exception to § 16-93-206).  Additionally, as pointed out by Respondent (doc.
38, at 8), the Arkansas Sentencing Commission ranks first degree murder in the most
serious class of offenses and its policy statement explicitly notes that the offense is subject
to the seventy percent limitation imposed by Act 1326 of 1995.   *See*
http://www.arkansas.gov/asc/grids/level10.pdf.

Furthermore, regardless of how these state statutes should be interpreted under
state law, Acts 530 and 534 refer to "discretionary" transfer only and cannot be construed
as conferring a protected liberty interest under federal law, particularly in light of the
statutory language clearly stating that the transfer provisions are not intended to create any
rights.  Additionally, § 16-93-206(c)(2)(A), enacted as part of Act 530, expressly states that
transfer pursuant to its provisions "is not automatic."  Act 530, § 2(c)(2).

Petitioner also refers to provisions from the Parole Board policy manual (doc. 47,
at 1-2).[8]  *See Parker*, 750 F.2d at 659-61 (parole regulations or policy statements can
create liberty interest).  However, none of the quoted language can be construed as
creating a right to transfer, much less transfer on a specific date.

---

[8]The manual is available at www.arbop.org/PolicyDocuments/ABPManual_rev092408.pdf.

Turning to a *Sandin* analysis, restricting a violent offender to serving seventy percent of his sentence before being eligible for transfer to DCC programming does not represent a "dramatic departure" from the terms of the imposed sentence. *Sandin*, 515 U.S. at 485. It is not an atypical or significant deprivation for an inmate convicted of violent crimes to remain subject for a longer period of time to the same conditions as those ordinarily experienced by a large number of inmates on a daily basis. In *Sandin*, the Supreme Court found that disciplinary confinement for thirty days "did not work a major disruption in [the plaintiff's] environment." *Id.* a 486. Here, not only will Petitioner not experience a "major disruption" in his environment, he will not be subject to any change at all. He will simply continue in the regular prison environment until his parole eligibility date, as do many other inmates. As stated, an inmate has no state or federal right to participation in rehabilitative or vocational activities, and the Supreme Court has recognized that transfer of an inmate to a facility with substantially less favorable and more restrictive conditions is "within the normal limits or range of custody which the conviction has authorized the State to impose." *Id.* at 478 (quoting *Meachum*, 427 U.S. at 225); *see Lee v. Governor of New York*, 87 F.3d 55, 58-59 (2d Cir. 1996) (no liberty interest in participating in temporary release program). Additionally, the date upon which an inmate becomes eligible for transfer to DCC programming or facilities does not "inevitably affect" the length of the sentence imposed, as Arkansas law explicitly provides that transfer to DCC supervision "shall not be considered as a reduction of sentence." Ark. Code Ann. § 16-93-1302(d).

When a prisoner is committed to the custody of a state penal authority, such as the ADC, "he can be assured of only one thing – that he will be released from the State's custody at the end of the term of years specified by the sentencing court." *Richmond v.*

16

*Duke*, 909 F. Supp. 626, 631 (E.D. Ark. 1995); *see Roach v. Arkansas Board of Pardons & Paroles*, 503 F.2d 1367, 1368 (8th Cir. 1974) (denial of parole does not increase sentence but merely perpetuates the status quo, *i.e.*, continued incarceration during the term of sentence).  Petitioner was sentenced to fifty years of imprisonment.  He has no federal or state liberty interest in the possibility of obtaining parole or any type of early release, or transfer to DCC facilities, supervision or programming, and he is thus not entitled to any due process protections in connection with diminishment of those possibilities.  Petitioner's due process claim should be dismissed as without merit.

       B.    Equal Protection.

Because Petitioner does not allege that he is a member of a protected class or that his fundamental rights have been violated, he must prove that Respondent "intentionally treated [him] differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Nolan*, 521 F.3d at 989-90.  Petitioner fails to meet this high burden of proof.  He has not shown that he has been treated differently from other similarly situated inmates, *i.e.*, violent offenders whose offense dates fall between the effective dates of Act 1326 and Act 1197.  Moreover, he alleges no facts showing that Respondent intentionally discriminated against him or used an irrational basis in determining his transfer eligibility.  His equal protection claim should be dismissed as without merit.

       C.    *Ex Post Facto* Violation.

Article I, § 10, of the United States Constitution prohibits the states from enacting an *ex post facto* law, that is, a law which, by retroactive operation, alters the definition of criminal conduct or increases the punishment for a crime after its commission. *Garner v.*

*Jones*, 529 U.S. 244, 249-50 (2000); *California Dep't of Corrections v. Morales*, 514 U.S. 499, 504 (1995).  Retroactive application of changes in the law governing parole of prisoners, in some instances, may violate this precept.  *Garner*, 529 U.S. at 250.

Petitioner argues that Act 1197 has been retroactively applied to him, thereby imposing a requirement that he serve seventy percent of his sentence before becoming eligible for transfer to DCC programming, when the law in effect at the time of his offenses referred only to eligibility for parole and when other existing laws specifically addressed transfer eligibility for offenders like him (*i.e.*, those convicted of certain Class Y felonies). He does not allege any alteration of the criminal conduct for which he is being punished. The question to be addressed, therefore, is whether Act 1197 "creates a significant risk of prolonging [the petitioner's] incarceration" or otherwise "increasing the measure of punishment" for the covered crimes.  *Garner*, 529 U.S. at 251-52.

Respondent contends that the wholly discretionary issue of transfer precludes Petitioner from demonstrating the existence of a sufficient risk to support an *ex post facto* violation, especially where the transfer he seeks has nothing to do with shortening his punishment.  The presence of discretion does not displace the protections of the *ex post facto* clause in the parole context.  *Id.* at 253.  Additionally, the Supreme Court has suggested that a law may be *ex post facto* when it alters punitive conditions but not the length of confinement. *Weaver v. Graham*, 450 U.S. 24, 32 (1981) ("a statute may be retrospective even if it alters punitive conditions outside the sentence"); *In re Medley*, 134 U.S. 160 (1890) (holding that a statute retroactively requiring solitary confinement for capital offenses and prohibiting a defendant sentenced to death from knowing the date of execution was invalid under *ex post facto* clause).

Nevertheless, the Court agrees that the factors cited by Respondent – including the discretionary aspect – support a determination that the statute at issue did not present a sufficient risk of increasing the punishment imposed for Petitioner's original crimes.

In evaluating an *ex post facto* claim, the Supreme Court has contrasted laws with "the purpose and effect of enhancing the range of available prison terms" with those that merely "'[alter] the method to be followed' in fixing a parole release date" without changing the substantive standards for granting parole or determining an appropriate sentence. *Morales*, 514 U.S. at 507-08. The prohibition against the application of *ex post facto* laws does not require that a criminal's sentence be carried out under the identical legal regime that prevailed at the time of his criminal offense. *Id.* at 510 n.6. The focus of the *ex post facto* inquiry "is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' nor ... on whether an amendment affects a prisoner's '*opportunity* to take advantage of provisions for early release,' ... but on whether any such change ... increases the penalty by which a crime is punishable." *Id.* at 506 n.3. The question "must be a matter of 'degree,'" and where a legislative adjustment creates only a "speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes," the change is not "of sufficient moment to transgress the constitutional prohibition" against *ex post facto* legislation. *Id.* at 509-10.

Here, Act 1197 had neither the purpose nor the effect of increasing the prison sentence imposed for Petitioner's crimes or prolonging his term of imprisonment. It did not alter the method or standards for determining the date he becomes eligible for release on parole or his suitability for parole or early release, or change the structure of Arkansas's parole eligibility law in any way. This distinguishes Petitioner's situation from that in *Garner*

19

and *Morales*, which involved retroactive changes in the frequency of parole hearings. Petitioner's claim does not involve parole at all, instead hinging on determination of the date he is eligible for discretionary transfer to DCC programming or supervision, which, by law, can have no effect on the length of his sentence.

Furthermore, Act 1197 does not eliminate Petitioner's consideration for any DCC programs, but merely delays the date on which he will be given the opportunity to be considered for them. As Petitioner acknowledges (doc. 47, at 9), admission into any DCC program is discretionary; therefore, calculation of his transfer eligibility date affects only his opportunity to participate in these programs. As there is no state or federal right to participate, there is only a possibility that he would be selected if given the opportunity.

This case is similar to *Lee v. Governor of New York*, *supra*, and *Dominique v. Weld*, 73 F.3d 1156 (1st Cir. 1996). In *Lee*, the Second Circuit held that rendering certain state prisoners ineligible for temporary release programs,[9] where previously they would have been eligible for discretionary consideration, was "simply a change in the legal regime and [was] not an increase in punishment" violating the *ex post facto* clause. *Lee*, 87 F.3d at 60. The Court noted that the evident purpose of the changed law was "not to add punishment, but rather to serve the regulatory purpose of limiting early community contact for those in the designated felony categories." *Id.* at 59. As here, the prisoners' eligibility for or participation in the temporary release programs would have no effect on the length of their sentences. *Id.*

---

[9]This included work release programs, furlough programs, community services programs, industrial training or educational leaves of absence. *Id.* at 57.

In *Dominique*, the First Circuit held that the *ex post facto* clause was not violated by a new prison regulation denying work release and lower security imprisonment to convicted sex offenders who failed to complete a treatment program.  Noting that the regulation was "driven by safety concerns, and not by a desire to impose further punishment on prisoners," the Court  held that "this change in the conditions determining the nature of [the plaintiff's] confinement while serving his sentence was an allowed alteration in the prevailing 'legal regime' rather than an 'increased penalty' for *ex post facto* purposes."  *Dominique*, 73 F.3d at 1162-63.  Again, the changed law did not affect the length of the prisoner's sentence or his parole options.  *Id.* at 1163.  The Court emphasized that the *ex post facto* clause "does not encourage close scrutiny by the federal courts of ongoing procedural or operational changes in prisons to coordinate treatment, promote security, and protect the public safety."  *Id.*

Similarly, postponing the date Petitioner becomes eligible for DCC programming is no more than a change in the legal regime governing the nature of his confinement and is not an increase in the punishment imposed for his crimes.  Restricting prisoners convicted of violent felony offenses from participating in community corrections programs furthers institutional and public safety goals, areas committed to the discretion of correctional authorities.  Under these circumstances, calculating Petitioner's transfer eligibility date under Act 1197 does not create a significant risk of prolonging his incarceration, nor does it create more than a speculative possibility of increasing the measure of punishment for his covered crimes.

Petitioner's *ex post facto* claims should be dismissed.

V.

In his latest pleading, Petitioner alleges that the possibility of transfer under Arkansas's broad community punishment scheme "encouraged the most persuasion in [his] guilty plea" (doc. 47, at 7).  As stated, Petitioner has already litigated one § 2254 petition regarding the validity of the first degree murder conviction resulting from his guilty plea.  To the extent that Petitioner is mounting a new challenge to the validity of his conviction and the underlying guilty plea, such claims are "second or successive" and can be brought only after obtaining authorization to proceed from the Eighth Circuit Court of Appeals.  *See* 28 U.S.C. § 2244(b)(3)(A).  Until an order of authorization is obtained, this Court has no jurisdiction to consider successive claims.  *Burton v. Stewart*, 549 U.S. 147, 152, 157 (2007).


VI.

This 28 U.S.C. § 2254 petition for writ of habeas corpus (doc. 2) should be **denied**, dismissing this action in its entirety.  The dismissal should be with prejudice as to all claims except those challenging the validity of his criminal convictions, which should be dismissed without prejudice to refiling if Petitioner obtains the necessary order from the United States Court of Appeals for the Eighth Circuit.

DATED this 17th day of November, 2009.


_____
UNITED STATES MAGISTRATE JUDGE